**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| VETON VEJSELI, BRETT PERRY, and CHRISTOPHER VILLINGER, on behalf of themselves and all similarly situated stockholders of Ionic Digital, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> SCOTT DUFFY, THOMAS DIFIORE, SCOTT FLANDERS, ELIZABETH LAPUMA, and IONIC DIGITAL, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    C.A. No. 2025-0232-BWD |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: May 19, 2025
Date Decided: May 21, 2025

A. Thompson Bayliss, Daniel J. McBride, Nicholas F. Mastria, Caleb R. Volz, ABRAMS & BAYLISS LLP, Wilmington, DE; OF COUNSEL: Adrienne M. Ward, Lori Marks-Esterman, Jacqueline Y. Ma, Daniel M. Stone, OLSHAN FROME WOLOSKY LLP, New York, NY; *Attorneys for Plaintiffs Veton Vejseli, Brett Perry, and Christopher Villinger*.

Martin S. Lessner, Alberto E. Chávez, Andrew J. Czerkawski, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; *Attorneys for Defendants Scott Duffy, Thomas DiFiore, Scott Flanders, and Ionic Digital, Inc.*

Bradford J. Sandler, Colin R. Robinson, PACHULSKI STANG ZIEHL & JONES LLP, Wilmington, DE; OF COUNSEL: John A. Morris, PACHULSKI STANG ZIEHL & JONES LLP, New York, NY; *Attorneys for Defendant Elizabeth LaPuma.*

**DAVID, V.C.**

This post-trial decision resolves an expedited challenge to (1) the adoption of a board resolution reducing the number of director seats up for election at a corporation's upcoming annual meeting and (2) the rejection of a director nomination notice under the corporation's advance notice bylaw.

In 2022, Celsius Network, LLC ("Celsius"), a cryptocurrency lending platform, filed for Chapter 11 bankruptcy before the U.S. Bankruptcy Court for the Southern District of New York. In January 2024, Ionic Digital, Inc. ("Ionic" or the "Company") emerged to hold and operate digital currency mining assets formerly owned by Celsius, with many Celsius creditors becoming Ionic stockholders. By the summer of 2024, Ionic's stockholders had already begun to publicly vent frustration with the Company's leadership, and in particular, with their failure to publicly list Ionic shares. Soon after, Ionic stockholders Veton Vejseli, Brett Perry, and Christopher Villinger ("Plaintiffs") partnered with Figure Markets Inc. ("Figure Markets") and GXD Labs, LLC ("GXD")—non-parties that do not own Ionic stock but have proposed commercial arrangements with Ionic—first to seek stockholder support to call a special meeting of stockholders to replace certain directors of Ionic, then to run a proxy contest at Ionic's first annual meeting.

In the face of the impending proxy contest, Ionic's classified board of directors (the "Board") executed a unanimous written consent setting the date of the annual meeting and resolving to reduce the size of the Board to eliminate one Class

1

I director seat up for election at the annual meeting. Ionic did not immediately disclose the board reduction resolution but did announce the annual meeting date, triggering a ten-day window for any stockholder to submit a director nomination notice under Ionic's advance notice bylaw. Plaintiffs, with financial backing from Figure Markets and GXD, submitted a notice nominating candidates for the two Class I director seats that Plaintiffs believed were up for election. Ionic then disclosed the board reduction resolution, and the Board rejected Plaintiffs' nomination notice for failing to disclose and attach copies of all agreements between Plaintiffs, Figure Markets, and GXD.

In this action, Plaintiffs contend that Ionic's directors breached their fiduciary duties by adopting the board reduction resolution and rejecting Plaintiffs' nomination notice. Applying enhanced scrutiny under *Unocal*, with sensitivity to the stockholder franchise under *Blasius*, this post-trial memorandum opinion concludes that Ionic's directors breached their fiduciary duties by reducing the size of the Board, not for a valid corporate purpose, but as an inequitable defensive measure. It separately concludes that the Board properly rejected Plaintiffs' nomination notice under Ionic's advance notice bylaw.

To restore the stockholders' ability to elect two Class I directors at Ionic's annual meeting, an injunction will issue directing the Board to reopen the ten-day nomination window under the advance notice bylaw to permit any Ionic stockholder

2

to submit new director nominations. Although the Board urges that Plaintiffs should not get a "do-over" after failing to comply with the advance notice bylaw once, they offer no good reason to deny Plaintiffs the ability to submit a new nomination during the reopened window so that, with the benefit of full disclosure, Ionic's stockholders can finally decide for themselves who should serve on the Board.

## I. BACKGROUND

The following facts were stipulated by the parties or proven by a preponderance of the evidence at a two-day trial held on May 8 and 9, 2025.[1]

### A. Ionic Emerges From The Celsius Bankruptcy.

Ionic is a Delaware corporation that was formed on January 5, 2024, as part of Celsius's Chapter 11 bankruptcy proceeding (the "Bankruptcy Action") before the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").[2] The Bankruptcy Court approved a plan (the "Plan") under which Celsius's digital currency mining assets were spun off into a newly formed entity—Ionic— and many Celsius creditors (including Plaintiffs) became Ionic stockholders.[3] Ionic entered into a management services agreement ("MSA") with the Plan's sponsor,

---

[1] The Stipulation and Pre-Trial Order is cited as "PTO ¶ __". Dkt. 115. Trial testimony is cited as "Tr. (Witness) at __" and joint trial exhibits are cited as "JX __". Dkt. 106.

[2] PTO ¶¶ 10, 15–18; *see In re Celsius Networks, LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.).

[3] PTO ¶ 15; Tr. (Villinger) at 114:22–115:2; Tr. (LaPuma) at 426:10–15; JX 274 at 5:5–6, 5:23–6:2.

3

U.S. Bitcoin ("Hut 8"), under which Hut 8 was to provide Bitcoin mining and other services to Ionic.[4]

Ionic has a classified Board with directors in each of three classes serving three-year terms.[5] When Ionic was formed, the Board comprised eight directors, including three in Class I (with terms expiring at Ionic's first annual meeting), three in Class II (with terms expiring at Ionic's second annual meeting), and two in Class III (with terms expiring at Ionic's third annual meeting).[6] Hut 8 exercised Class B designation rights to appoint one Class I director and one Class II director, and a creditors' committee appointed the remaining directors.[7]

Since November, the Board has comprised just four directors—Elizabeth LaPuma (a Class I director), Scott Flanders (a Class II director), Scott Duffy (a Class III director), and Thomas DiFiore (a Class III director) (collectively, the "Director Defendants," and with Ionic, "Defendants").[8]

### B.  Ionic's Advance Notice Bylaw

The Second Amended and Restated Bylaws of Ionic Digital, Inc. (the "Bylaws"), effective from June 19, 2024 to February 13, 2025, include advance

---

[4] JX 4.

[5] JX 6 at Art. VI § 3.

[6] *Id.*; JX 8 at 88; Tr. (Duffy) at 326:20–328:24.

[7] JX 4 at 6; JX 6 at Art. VI § 3; JX 8 at 88; Tr. (Duffy) at 326:20–328:24.

[8] Tr. (Duffy) at 326:20–328:24.

notice procedures for director nominations and business proposals.[9]   Namely, Section 2.4 of the Bylaws (the "Advance Notice Bylaw") requires that, "[t]o be properly brought before an annual meeting, nominations of persons for election to the Board . . . must be: . . . properly brought before the annual meeting by a stockholder of the Corporation who . . . has timely complied in proper written form with the procedures set forth in this Section 2.4."[10]   A nominating stockholder must deliver "timely notice thereof in proper written form, setting forth all information required under this Section 2.4[.]"[11]   If, as here, "no annual meeting was held in the previous year," to be timely, the notice must be delivered "not later than the Close of Business on the later of (i) the 90th day prior to such annual meeting or (ii) the 10th day following the day on which a Public Announcement . . . of the date of such annual meeting is first made by the Corporation."[12]   In addition to the notice, a nominating stockholder must also deliver "a written questionnaire with respect to the background and qualification of [the nominees] and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire

---

[9] JX 9 [hereinafter Bylaws]; *see* JX 195 (Third Amended and Restated Bylaws).

[10] Bylaws § 2.4(i).

[11] *Id.* § 2.4(ii).

[12] *Id.*

5

shall be provided by the Secretary upon written request of any stockholder of record identified by name within five (5) Business Days of such written request) . . . ."[13]

The Advance Notice Bylaw also specifies certain information that must be included in a nomination notice. Pertinent to the current dispute, Section 2.4(iii)(c)(9) requires that:

> To be in proper written form, the Noticing Stockholder's notice must also set forth: . . . (9) any agreements that would be required to be described or reported pursuant to Item 5 or Item 6 of Schedule 13D or filed as exhibits pursuant to Item 7 of Schedule 13D (regardless of whether the requirements to file a Schedule 13D are applicable to such stockholder or beneficial owner)[.][14]

Item 6 of Schedule 13D directs a filer to:

> Describe any contracts, arrangements, understandings, or relationships (legal or otherwise) among the persons named in Item 2 and between such persons and any person with respect to any securities of the issuer, including any class of such issuer's securities used as a reference security, in connection with any of the following: call options, put options, security-based swaps or any other derivative securities, transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, guarantees of profits, division of profits or loss, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, understandings, or relationships have been entered into.[15]

Item 7 of Schedule 13D states:

---

[13] *Id.* § 2.4(v).

[14] *Id.* § 2.4(iii)(c)(9).

[15] 17 C.F.R. § 240.13d-101 (Item 6).

The following shall be filed as exhibits: Copies of written agreements relating to the filing of joint acquisition statements as required by Rule 13d–1(k) and copies of all written agreements, contracts, arrangements, understanding, plans or proposals relating to: (1) The borrowing of funds to finance the acquisition as disclosed in Item 3; (2) the acquisition of issuer control, liquidation, sale of assets, merger, or change in business or corporate structure, or any other matter as disclosed in Item 4; and (3) the transfer or voting of the securities, finder's fees, joint ventures, options, puts, calls, guarantees of loans, guarantees against loss or of profit, or the giving or withholding of any proxy as disclosed in Item 6.[16]

Item 4, incorporated by Item 7, requires disclosure of any "plans or proposals" that relate to or would result in (i) "[a]ny change in the present board of directors or management of the issuer, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board;" (ii) "[a]ny material change in the present capitalization or dividend policy of the issuer;" or (iii) "[a]ny other material change in the issuer's business or corporate structure[.]"[17]

## C. Figure Markets And GXD Propose Commercial Arrangements With Ionic.

Non-party Figure Markets is a "blockchain native, decentralized custody exchange for digital assets" that launched in March 2024.[18] Non-party GXD is a

---

[16] *Id.* (Item 7).

[17] *Id.* (Item 4).

[18] Mike Cagney & June Ou, *Figuring Out the Future with Figure*, FIGURE MARKETS (Mar. 21, 2024), https://www.figuremarkets.com/resources/insights/figuring-out-the-future-with-figure.

"digital asset and blockchain operating, investment, and advisory business."[19] Neither Figure Markets nor GXD owns Ionic stock.[20]

On May 22, 2024, Figure Markets' co-founder and Chief Executive Officer, Michael Cagney, proposed to the Board that Ionic should list its stock on Figure Markets' alternative trading system ("ATS").[21] The Board did not accept Figure Markets' proposal.

Less than a week later, on May 28, GXD's co-founder and managing partner, David Proman, contacted the Board, expressing a desire to replace Hut 8 as Ionic's management services provider.[22] The Board did not accept GXD's proposal.

### D. Vejseli Partners With Figure Markets To Call A Special Meeting.

In the seventeen months since the Company's formation, five of Ionic's eight initial directors have left the Board.[23] Ionic has employed three Chief Executive Officers, two Chief Financial Officers, and two Chief Legal Officers.[24] Its auditor

---

[19] GXDLABS, https://www.gxdlabs.io/ (last visited May 21, 2025).

[20] PTO ¶ 9.

[21] JX 16 at 37–38.

[22] JX 501.

[23] JX 8 at 85, 88; Tr. (Duffy) at 326:20–328:24.

[24] JX 8 at 85; JX 10; JX 12; JX 123; JX 140.

also resigned.[25]  Meanwhile, because Ionic has not yet publicly listed its shares and transfer restrictions are in place, stockholders cannot sell their shares.[26]

In the summer of 2024, Ionic stockholders, including Vejseli, publicly vented their frustration with the Company's failure to publicly list its shares to provide stockholders liquidity.  For example, in late July, Vejseli filed a letter on the public docket in the Bankruptcy Action to express concerns over Ionic's failure to list its stock and the "shocking amount of turmoil" amongst Ionic's directors and officers.[27] Vejseli called for greater transparency and suggested the "only other remedy would be to use the proxy rules afforded to shareholders."[28]  In early August, Vejseli posted on social media that it "[m]ight be time [to] convene a vote of shareholders to get out of this mess."[29]

At the same time, Figure Markets tried to purchase Ionic stock, with the intention of advancing a stockholder proposal to encourage the Board to list Ionic's shares on Figure Markets' ATS.[30]  Several Ionic stockholders expressed interest in

---

[25] JX 12; JX 81.

[26] *See* JX 6 at Art. XII; Tr. (Vejseli) at 34:11–19, 68:15–18, 81:4–6.

[27] JX 11.

[28] *Id.*

[29] JX 426.  The post featured a Bernie Sanders meme stating, "I am once again asking that you stop robbing creditors."  *Id.*

[30] JX 23; JX 43 at 3.

selling their shares to Figure Markets, but Ionic's transfer agent refused the transactions due to transfer restrictions in place.[31]

In the following weeks, Vejseli partnered with Figure Markets to seek stockholder support to call a special meeting of Ionic stockholders to effect change at the Company.[32] Through outreach on social media, they collected names and contact information from thousands of Ionic stockholders via an electronic form that expressed the desire to remove three members of the Board.[33]

To further that effort, on September 4, Vejseli made a books and records demand under 8 *Del. C.* § 220 ("Section 220"), seeking Ionic's stock list and other materials (the "September Demand").[34] Ionic responded that Vejseli lacked a proper purpose for seeking books and records, but nevertheless agreed to meet and confer

---

[31] *See* JX 43 at 3.

[32] *See, e.g.*, JX 14; JX 15; JX 71; JX 72. On August 30, Vejseli and Figure Markets entered into a group agreement governing their joint efforts concerning Ionic (the "First Group Agreement"). JX 39 ¶ 4. Under the First Group Agreement, Figure Markets had the right to "pre-approve . . . expenses incurred in connection with the Group's activities" and Vejseli would not otherwise "incur any expenses . . . in connection with" the group's purpose as defined in the First Group Agreement. *Id.* ¶ 5. The parties agreed that this obligation would survive termination of the agreement. *Id.* ¶ 10.

[33] JX 71; JX 72.

[34] PTO ¶ 19; JX 43. On September 11, Vejseli, Figure Markets, and GXD entered into an Amended & Restated Mutual Nondisclosure and Common Interest Agreement (the "September 11 MNDA") in "anticipation of the evaluation, negotiation, and/or consummation of joint business opportunities between the Parties." JX 51.

on a potential production subject to a confidentiality agreement.[35]  Ionic later proposed a draft confidentiality agreement prohibiting any third party (including Figure Markets and GXD) from "directly or indirectly pay[ing], reimburs[ing], or otherwise cover[ing] any fees, expenses, or costs incurred by [Vejseli] in connection with [Ionic], the [d]emand, or this [a]greement" (the "Outside Funds Provision").[36] Vejseli did not agree to the Outside Funds Provision.

On October 28, Vejseli, Figure Markets, GXD, and lawyers at Olshan Frome Wolosky LLP ("Olshan")[37] met with the Board.[38]  At that meeting, the group encouraged the Board to replace directors, appoint a new CEO, immediately list Ionic's stock, terminate the MSA, and replace Hut 8 with GXD.[39]  The next day, Ionic issued a press release announcing that it had met with "an Ionic shareholder

---

[35] PTO ¶ 20; JX 52.

[36] JX 101.

[37] On September 24, Vejseli and Olshan entered into a representation agreement (the "September 24 Olshan Agreement") providing that Olshan would represent Vejseli "in connection with [his] investment in" Ionic, "specifically as it relates to [his] letter to Ionic Digital sent pursuant to Section 220 . . . and purposes stated therein[,]" with Figure Markets responsible for paying all related fees.  JX 54.  On September 25, Vejseli, Figure Markets, and GXD entered into another Amended & Restated Mutual Nondisclosure and Common Interest Agreement (the "September 25 MNDA").  JX 516.

[38] JX 95; JX 522.

[39] JX 97; JX 522.

and other parties," including Figure Markets and GXD, "regarding proposed governance changes and an alternative operating path forward for the Company."[40]

### E.   More Stockholders Join The Effort To Effect Change At Ionic.

Back in August, Brett Perry, then a Board observer, reached out to Ionic stockholders on social media: "[f]ellow Ionic shareholders, you've been kept in the dark too long . . . .  I'll ensure your voices are heard by the board & management."[41] In late September, GXD asked Vejseli whether Perry would be willing to work with the group, and Vejseli confirmed that Perry was "more than willing to meet and help [them] out in any way possible," having "offered multiple times already."[42]

---

[40] JX 94.

[41] JX 13.  Perry was later removed as a Board observer "due to [his] recent social media activity." *Id.*

[42] JX 55.  On October 7, Vejseli and Figure Markets entered into an Amended & Restated Group Agreement (the "Second Group Agreement") that added another third party, Nexxus Holdings Advisor LLC ("Nexxus"), as a member of the group.  JX 64.  The Second Group Agreement gave Figure Markets and Nexxus the right to pre-approve "all reasonable expenses incurred in connection with the Group's activities[,]" which survived termination of the agreement.  *Id.* ¶¶ 5, 10.  Figure Markets and Nexxus also entered into a side letter agreement (the "October 7 Side Letter") in which they agreed to "fund 50% each of any Dutch auction tender" for Ionic stock.  JX 63 ¶ 2.  On October 21, Vejseli, Figure Markets, and GXD entered into another Group Agreement (the "Third Group Agreement"), disbanding the prior group with Nexxus, with GXD stepping into its place.  JX 80.  Figure Markets and Nexxus executed a letter agreement acknowledging that the October 7 Side Letter was terminated but agreeing that, "should the efforts of Figure Market" and Vejseli "to continue to pursue the [p]urpose" of the Second Group Agreement "not result in a negotiated settlement with" Ionic "substantially satisfying the [p]urpose or substantial progress toward a negotiated settlement within one calendar month from the date hereof, Figure [Markets] agrees to negotiate in good faith with Nexxus toward the entry into a new

In early November, Vejseli separately reached out to Christopher Villinger and several other Ionic stockholders, explaining that Ionic was "giving [him] the run around about getting the shareholder list," and asked if they would "join the 220 filing with [him] for books and records."[43] On December 11, Perry, Villinger, and seven other Ionic stockholders made a separate books and records demand under Section 220, seeking Ionic's stock list and related materials to run a proxy contest at Ionic's upcoming annual meeting (the "December Demand").[44] Ionic again refused to produce the stock list unless the stockholders would agree to the Outside Funds Provision.[45]

---

Group Agreement with Nexxus on substantially the same terms" as the Second Group Agreement. JX 521. Figure Markets further agreed to "strongly recommend" to the Board that it "approve and promptly hold a Dutch auction" with "Nexxus as the exclusive capital provider." *Id.*

[43] JX 112. On December 4, Ionic terminated the MSA and redeemed Hut 8's Class B stock, eliminating Hut 8's right to appoint two directors. *See* JX 129; JX 255 at 3. After Ionic terminated its contract with Hut 8, the Board was reduced from eight to six directors, removing the Class B designated seats. *See* JX 255 at 3; JX 413 at 4; Tr. (Duffy) at 329:1–5.

[44] PTO ¶ 21; JX 138. On December 6, Perry and Villinger entered into a representation agreement with Olshan and several other Ionic stockholders in connection with their books and records demand (the "December 6 Olshan Agreement"). JX 131. On December 10, Plaintiffs, Figure Markets, GXD, and other Ionic stockholders executed an Amended and Restated Mutual Non-Disclosure and Common Interest Agreement (the "December 10 MNDA"). JX 136.

[45] JX 147.

**F.     Vejseli, Figure Markets, And GXD Continue To Engage With The Board And Ionic Anticipates Needing A Proxy Solicitor.**

Vejseli, Figure Markets, and GXD continued to engage with the Board throughout January 2025.  On January 6, Figure Markets' Chief Investment Officer, Michael Abbate, contacted Ionic director Elizabeth LaPuma to "extend the olive branch to offer assistance."[46]  On January 8 and 11, Vejseli also emailed LaPuma, reminding her that "3,500 shareholders . . . signed [a] form to call a special [m]eeting" and offering to discuss "candidates for the [B]oard."[47]  The following week, on January 16, the Board held a meeting at which it discussed the "hostile activists" and their "books and records request."[48]

On January 20, LaPuma sent Vejseli an email responding to unflattering comments posted online, describing his behavior as unacceptable for a "putative Board candidate" and "aspiring fiduciary."[49]

---

[46] JX 154.

[47] *Id.*

[48] JX 162.

[49] JX 164.

The next day, Duffy and DiFiore separately exchanged messages about recent social media posts from Cagney discussing the timing of Ionic's annual meeting.[50] DiFiore told Duffy that "we should hire a proxy solicitor if we haven[']t yet."[51]

### G. The Board Schedules The Annual Meeting And Amends The Bylaws To Reduce The Number of Class I Director Seats Up For Election.

On February 6 at 7:05 p.m., Ionic's Chief Legal Officer, Laura Schnaidt, emailed the Board a draft unanimous written consent (the "February 6 Consent") scheduling Ionic's annual meeting for March 17 (the "Annual Meeting") and setting a February 7 record date.[52] The February 6 Consent also purported to amend the Bylaws to reduce the size of the Board from six directors to five, "with one director serving as a Class I director, two directors serving as Class II directors and two directors serving as Class III directors" (the "Board Reduction Resolution").[53] Apologizing for the "short notice," Schnaidt asked the Board to execute the February 6 Consent "tonight" so that Ionic could issue a press release "after we have the resolution signed."[54]

---

[50] JX 165; JX 166.

[51] JX 165.

[52] PTO ¶ 26; JX 181; JX 185.

[53] JX 185.

[54] JX 181.

Three of Ionic's four directors submitted electronic signatures that evening,[55] and at 10:26 p.m., Ionic issued a press release (the "February 6 Press Release"), announcing that Ionic would hold the Annual Meeting on March 17.[56] Despite the late hour, Olshan saw the February 6 Press Release and requested Ionic's director nominee questionnaire that night, setting the five-business-day clock for Ionic to provide a copy.[57]

The February 6 Press Release did not disclose the Board Reduction Resolution.[58] Just a few days later, DiFiore, Duffy, and a lawyer from Ionic's outside counsel, White & Case LLP, exchanged text messages, "wonder[ing] who

---

[55] Flanders, LaPuma, and Duffy executed the February 6 Consent before the February 6 Press Release was issued. JX 400. DiFiore executed the February 6 Consent the next morning. *Id.* At trial, DiFiore testified that he viewed the February 6 Consent on the evening of February 6 and believed he had "signed it by pressing a button." Tr. (DiFiore) at 509:18–20. The next morning, because he had not received a confirmation receipt, he "logged back in again, and [he] saw [he] didn't hit the 'confirm' button. So [he] pressed 'confirm' and then received the confirmation." *Id.* at 510:2–7. Plaintiffs assert that DiFiore's testimony is "not credible" because DiFiore's electronic signature generated by PandaDoc indicates DiFiore "viewed" the document at 10:55 a.m. UTC (5:55 a.m. EST) on February 7. *See* PPTB at 15; JX 400. According to Plaintiffs, the timing matters because under the Advance Notice Bylaw, the February 6 Press Release qualifies as a "Public Announcement" triggering the nomination window only if it was "released by the Corporation following its customary procedures," which require approval from all directors before a unanimous written consent becomes effective. Bylaws § 2.4(vii)(f)(7). Despite the PandaDoc "viewed" timestamp, I am not convinced that DiFiore was lying when he testified that he approved the February 6 Consent on the evening of February 6.

[56] *See* PTO ¶ 27; JX 177.

[57] JX 402; JX 531; Bylaws § 2.4(v).

[58] JX 177.

16

[Plaintiffs] are going to put up when they find out it is just 1 seat."[59] The White &

Case lawyer joked, "[t]hey[']ll go nuts if they see its 1x seat."[60]

### H.   Plaintiffs File Lawsuits Under Section 220 And Section 211.

On February 10, Plaintiffs initiated a summary proceeding in this Court to

enforce their books and records demands (the "220 Action").[61] Plaintiffs also filed

a separate action under 8 *Del. C.* § 211 to enforce statutory quorum requirements at

the Annual Meeting (the "211 Action").[62]

### I.   Plaintiffs Deliver A Nomination Notice Identifying Two Director Nominees.

On February 12, Ionic sent a copy of its director nominee questionnaire to

Plaintiffs.[63]

On February 14, Plaintiffs, Figure Markets, and GXD entered into an

agreement (the "Solicitation Agreement") for "the purpose of (i) supporting the

[n]ominating [s]tockholders in their efforts to achieve the election of the persons

---

[59] JX 190.

[60] *Id.*

[61] *Vejseli v. Ionic Digit., Inc.*, C.A. No. 2025-0138-BWD (Del. Ch.).

[62] *Vejseli v. Ionic Digit., Inc.*, C.A. No. 2025-0137-BWD (Del. Ch.).

[63] JX 532.

they have nominated (at the [n]ominating [s]tockholders' sole discretion) to the Board . . . at the 2025 [A]nnual [M]eeting . . . of [Ionic] . . . ."[64]

Plaintiffs then submitted a notice (the "Nomination Notice") nominating Michael Abbate and Oliver Wiener for the two Class I director seats that Plaintiffs believed were up for election.[65] The Nomination Notice summarized, but did not attach, the September 11 MNDA, December 10 MNDA, and Solicitation Agreement.[66] The Nomination Notice did not disclose prior agreements between members of the group, including the First Group Agreement, September 24 Olshan Agreement, September 25 MNDA, Second Group Agreement, October 7 Side Letter, Third Group Agreement, or December 6 Olshan Agreement.[67]

The window to submit nominations closed on Sunday, February 16.[68] With Ionic's agreement, Plaintiffs submitted completed director nominee questionnaires on Monday, February 17.[69]

---

[64] PTO ¶ 28; JX 539.

[65] PTO ¶ 29; JX 202; JX 203.

[66] JX 202.

[67] *See id.*

[68] *See* Bylaws § 2.4(ii).

[69] JX 206.

**J.      Ionic Discloses The Board Reduction Resolution And The Board Rejects The Nomination Notice.**

On February 20, Ionic updated its website to disclose that the Board had adopted the Board Reduction Resolution.[70]

One week after receiving the Nomination Notice, on February 21, the Board's Nominating and Corporate Governance Committee (the "Committee") met to discuss director nominations in connection with the Annual Meeting.[71]  At that meeting, the Committee concluded that "keeping Ms. LaPuma in place . . . would be in the best interest of the Company and its shareholders," and "determined that the Company would not recommend the purported nominees Mr. Abbate and Mr. Wiener" because Abbate "would not be an appropriate fiduciary" and the Committee "had never heard of Mr. Wiener previously and did not have an opinion."[72]  On February 24, the Board met and had a similar discussion.[73]

---

[70] PTO ¶ 30.  Plaintiffs did not discover that Ionic had updated its website to disclose the Board Reduction Resolution until February 26.  *Id.* ¶ 35.

[71] JX 221; PTO ¶ 31.

[72] JX 221.

[73] *Compare id.*, *with* JX 230 (describing discussions at the February 21 Committee meeting and the February 24 Board meeting with similar language).  The same day, Ionic issued a press release, a "Notice of 2025 Annual Meeting of Stockholders," an "Ionic Stockholder Letter," and investor "FAQs."  PTO ¶ 34.  The Ionic Stockholder Letter disclosed that one incumbent director, LaPuma, would be "standing for re-election to the single Class I seat on the Board that is up for election at the Annual Meeting."  JX 227.  The Ionic Stockholder Letter, the press release, and the FAQs claimed that Plaintiffs are acting "on behalf of" Figure Markets and Cagney.  *Id.*; JX 229; JX 240.

On February 28 at 5:22 p.m., the Board's outside counsel at Young Conaway Stargatt & Taylor, LLP emailed Schnaidt a "rough memo" advising that the Nomination Notice failed to comply with the Advance Notice Bylaw (the "YCST Memo").[74] Schnaidt forwarded the YCST Memo to the Board at 5:53 p.m.[75] Seven minutes later, at 6:00 p.m., the Board met to discuss the Nomination Notice.[76] At the meeting, the Board "discussed considerations around the protections of advance notice bylaws and how they would operate to protect against the Dissident Stockholders' failure to disclose information in an attempt to hide information from Ionic's stockholders concerning potential conflicts of interest among the Dissident Stockholders, Figure Markets and GXD," as well as "concerns that without complete information in the Notice, stockholders would not be able to properly vet proxy solicitations from the Dissident Stockholders who are financially backed by non-stockholder third-parties."[77] After discussion, the Board unanimously determined to reject the Nomination Notice because it failed to comply with the Advance Notice

---

[74] JX 411.

[75] *Id.*; *see* Tr. (Flanders) at 267:4–13.

[76] PTO ¶ 36; JX 247; Tr. (Flanders) at 267:4–13.

[77] JX 247.

Bylaw by omitting copies of referenced agreements and failing to disclose other agreements.[78]

On March 3, Ionic issued a press release announcing that the Nomination Notice was invalid because it failed to comply with the Advance Notice Bylaw.[79] The March 3 press release explained that:

> More specifically, . . . the Notice failed to attach a copy of the funding agreements between the Dissident Stockholders and the non-stockholders that financially support the Dissident Stockholders (including, among other things, through the payment of the Dissident Stockholders' attorney fees, costs, and expenses). The Notice also failed to disclose required information about the plans and proposals for Ionic by the Dissident Stockholders, their purported nominees, and the non-stockholder investors that are financially backing the Dissident Stockholders, including Mike Cagney, his company Figure Markets, and GXD Labs.[80]

The same day, Ionic's counsel informed Plaintiffs' counsel that on February 28, the Board had determined that the Nomination Notice did not comply with the Advance Notice Bylaw.[81] The email stated that:

---

[78] *Id.* Plaintiffs produced the undisclosed agreements in the 220 Action on February 23, 2025. *See* JX 428.

[79] PTO ¶ 38; JX 259. Schnaidt sent Ionic's public relations firm draft language for the press release stating that the Board Reduction Resolution was adopted for "business reason[s]" that included "good corporate housekeeping to reflect the termination of the [MSA] with Hut 8" and "eliminat[ing] the ability for there to be a deadlock, which is a matter of good corporate governance." JX 255; JX 413. The language was not included in the final press release.

[80] JX 259.

[81] PTO ¶ 38.

Ionic's Board of Directors made this determination because the Nomination Notice: (1) failed to attach a copy of the funding agreements between the Nominating Stockholders' and Figure Markets/GXD; and (2) failed to disclose any information about the plans and proposals for Ionic held by the group consisting of the Nominating Stockholders, Figure Markets, and GXD.[82]

On March 5, while claiming Ionic's "belated deficiency notices were pretextual and baseless," Plaintiffs' counsel sent Ionic's counsel a copy of the September 11 MNDA, December 10 MNDA, Solicitation Agreement, First Group Agreement, Second Group Agreement, and Third Group Agreement.[83]

## K. The Court Orders Ionic To Produce The Stock List In The 220 Action.

On March 13, this Court rendered a post-trial decision in the 220 Action, determining that Plaintiffs had a proper purpose for obtaining Ionic's stock list:

I am convinced that each of the plaintiffs here seeks the stock list materials because he sincerely wants to run a proxy contest to improve governance at the company. Each of the plaintiffs has credible reasons for that purpose. The stockholders want greater transparency and liquidity for their shares, which have not traded for over a year; and numerous changes to Ionic's directors, officers, and auditor raise questions about the company's governance and strategic direction. . . . Ionic suggests that Vejseli does not truly seek to represent the interests of Ionic stockholders, and instead has "lent his name" to the demand in order to seek "justice" from individuals who angered him in the Celsius bankruptcy. But it is clear to me, both from Vejseli's testimony and the larger record, that that is not the case. . . . Moreover, even if there were reasons to doubt the sincerity of Vejseli's purposes, both Villinger and

[82] JX 260.

[83] JX 266.

22

Perry have significantly larger shareholdings in Ionic. Villinger was Celsius's seventh largest creditor and lost "in the 8 figures" in the bankruptcy, while Perry lost approximately $30 million. Both testified credibly that they are focused on finding qualified, competent managers and a path to liquidity. Accordingly, I find plaintiffs' stated purposes for seeking the stock list are sincere. I further find that plaintiffs are not simply "proxies," "surrogates," or "shills" for Figure Markets and GXD. . . . [O]n balance, for all the reasons I've just explained, I find that the plaintiffs are not proxies or surrogates for Figure Markets and GXD.[84]

## L. Procedural History

Plaintiffs Vejseli and Perry initiated this action on March 3, 2025 through the filing of a Verified Class Action Complaint Challenging Board Reduction Resolution (the "Initial Complaint").[85] Plaintiffs moved for expedition and to preliminarily enjoin the Annual Meeting.[86]

On March 6, the Court held a hearing at which it expedited the proceedings in advance of a hearing on Plaintiffs' motion for preliminary injunction.[87] The next day, Ionic decided to postpone the Annual Meeting until thirty days after the Court rules in this action, obviating the need for a preliminary injunction.[88]

---

[84] *Vejseli v. Ionic Digit., Inc.*, C.A. No. 2025-0138-BWD, at 35:4–39:22 (Del. Ch. Mar. 13, 2025) (TRANSCRIPT).

[85] Dkt. 1.

[86] *Id.*

[87] Dkts. 13, 21.

[88] Dkts. 16, 22.

On March 19, Plaintiffs filed the operative Amended Verified Class Action Complaint Challenging Board Reduction Resolution (the "Amended Complaint").[89] The Amended Complaint adds Villinger as a plaintiff and asserts four counts: Count I alleges a claim challenging the Board Reduction Resolution as a breach of fiduciary duty; Count II alleges a claim challenging the Board Reduction Resolution under the Bylaws; Count III alleges a claim challenging the Board's rejection of the Nomination Notice as a breach of fiduciary duty; and Count IV alleges disclosure claims.[90]

In the two months leading up to trial, the Court resolved a motion to expedite, a second scheduling dispute, three discovery motions, a motion to dismiss, and numerous issues at the pre-trial conference (including a witness-advocate dispute). The Court held a two-day trial on May 8 and 9.[91] On May 10, the Court denied

---

[89] Am. Verified Class Action Compl. Challenging Board Reduction Resolution [hereinafter Compl.], Dkt. 24.

[90] *Id.* ¶¶ 133–59.

[91] Dkt. 124. Defendants Duffy, DiFiore, Flanders, and Ionic filed their Pretrial Brief on May 5, 2025. Defs.' Pretrial Br. [hereinafter DB], Dkt. 111. Plaintiffs filed their Pretrial Brief on May 6. Pls.' Opening Pre-Trial Br. [hereinafter PB], Dkt. 113. Defendant LaPuma submitted a Joinder to Defendants' Pretrial Brief on May 7. Dkt. 117.

Plaintiffs' Motion for Class Certification under Court of Chancery Rule 23.[92] The parties filed post-trial briefing on May 19.[93]

## II. ANALYSIS

In Counts I, III, and IV of the Amended Complaint, Plaintiffs contend that the Director Defendants breached their fiduciary duties by adopting the Board Reduction Resolution, improperly rejecting the Nomination Notice, and issuing false and misleading disclosures. To obtain permanent injunctive relief, Plaintiffs must show that "'the merits of [their] claim[s] are supported by the law and the preponderance of the evidence,' irreparable harm, and that the balance of the equities favors injunctive relief." *Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *8 (Del. Ch. Feb. 14, 2022) (quoting *Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at *13 (Del. Ch. Oct. 13, 2021)).

Plaintiffs succeed on the merits of Count I and aspects of Count IV. Injunctive relief is warranted, as detailed below.

### A. The Director Defendants Breached Their Fiduciary Duties By Adopting The Board Reduction Resolution.

Counts I and II challenge the validity of the Board Reduction Resolution as (1) the product of a breach of fiduciary duty and (2) inconsistent with the Bylaws.

---

[92] Dkt. 123.

[93] Pls.' Post-Trial Br. [hereinafter PPTB], Dkt. 129; Defs.' Post-Trial Br. [hereinafter DPTB], Dkt. 130.

Because Plaintiffs succeed on the fiduciary duty claim, the Court does not resolve Plaintiffs' alternative theory under the Bylaws.

> **1. Enhanced Scrutiny Applies To The Board Reduction Resolution, Which Was Not Adopted On A "Clear Day."**

In Count I, Plaintiffs contend that the Director Defendants breached their fiduciary duties by adopting the Board Reduction Resolution. As a predicate issue, the parties dispute which standard of review governs this claim.

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). Delaware's intermediate standard of review—enhanced scrutiny—applies to the Board Reduction Resolution, which was adopted as a defensive measure in the face of an impending proxy contest.

"Delaware courts scrutinize closely corporate acts that affect stockholder voting." *Kellner v. AIM ImmunoTech Inc.*, 320 A.3d 239, 259 (Del. 2024). "As Chancellor Allen famously stated in *Blasius Industries, Inc. v. Atlas Corp.*, '[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests.'" *Id.* (quoting *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988)). Thus, in *Coster v. UIP Companies, Inc.*, the Delaware Supreme Court reaffirmed that when a stockholder challenges board action that interferes with the election of directors, the Court applies enhanced scrutiny under *Unocal*, with sensitivity to the stockholder franchise under *Blasius*, "to protect the

26

fundamental interests at stake—the free exercise of the stockholder vote as an essential element of corporate democracy." 300 A.3d 656, 672 (Del. 2023) (first citing *Chesapeake Corp. v. Shore*, 771 A.2d 293, 323 (Del. Ch. 2000); and then citing Lawrence A. Hamermesh et. al., *Optimizing the World's Leading Corporate Law: A Twenty-Year Retrospective and Look Ahead*, 77 BUS. LAW. 321, 330–31 (2022)). The Board Reduction Resolution here "affect[s] . . . an election of directors" by reducing the number of director seats on which Ionic stockholders can vote at the Annual Meeting. *Pell v. Kill*, 135 A.3d 764, 787 (Del. Ch. 2016) (quoting *Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 811 (Del. Ch. 2007)). Enhanced scrutiny therefore applies.

Defendants nevertheless contend that the business judgment rule should govern review of the Board Reduction Resolution, relying on *Openwave Systems Inc. v. Harbinger Capital Partners Master Fund I, Ltd.*, 924 A.2d 228 (Del. Ch. 2007). In *Openwave*, the Court reviewed a board's decision to reduce director seats as a valid exercise of business judgment where the trial evidence showed that the board's decision occurred nearly two months before a proxy contest launched, proving "the reduction in the number of board seats was not a defensive measure designed to interfere with the stockholder franchise." *Id.* at 243. Put differently, because the resolution in *Openwave* was adopted on a "clear day," not in response to a proxy contest, the Court did "not impose the heightened standard of review

27

applied to takeover defenses or attempts to circumvent the stockholder franchise."

*Id.*; *see Pell*, 135 A.3d at 789 (noting that *Openwave* "appl[ied] [the] business judgment rule to [a] decision to reduce [the] size of [a] board to eliminate vacant seats where [the] directors acted on a clear day with no proxy contest imminent"); *see also In re Ebix, Inc. S'holder Litig.*, 2018 WL 3545046, at *8 (Del. Ch. July 17, 2018) (applying business judgment review where "the Board did not adopt the . . . Bylaw Amendments in response to any present or future threat" of a proxy contest).[94]

In stark contrast to *Openwave*, the trial evidence here *overwhelmingly* supports a finding that the Board Reduction Resolution was not adopted on a "clear day." For example:

- The Board knew by August 2024 that Vejseli sought stockholder support for a special meeting to replace Ionic directors.[95]  On September 4, Vejseli also served a books and records demand, seeking a stock list to aid in that effort.[96]

- On October 28, Vejseli, Figure Markets, and GXD met with the Board.[97]  Flanders testified that he knew at that meeting that Vejseli, Figure Markets,

---

[94] Defendants emphasize that "a majority of the Board members are not up for re-election this year . . . ."  DB at 61–62.  "Enhanced scrutiny, however, is not limited to electoral contests where the entire board might be replaced."  *Pell*, 135 A.3d at 786.  "Enhanced scrutiny also applies in other situations where the law provides stockholders with a right to vote and the directors take action that intrudes on the space allotted for stockholder decision-making."  *Reis*, 28 A.3d at 457 (first citing *Mercier*, 929 A.2d at 804–10; and then citing *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1806376, at *10–11 (Del. Ch. Dec. 4, 2000)).

[95] JX 426.

[96] JX 43.

[97] JX 95; JX 97; JX 522.

and GXD "were working together to replace board members on Ionic's board."[98]

- On December 11, Perry, Villinger, and seven other stockholders sent another books and records demand, seeking Ionic's stock list to run a proxy contest.[99]

- On January 8 and 11, 2025, Vejseli told LaPuma that 3,500 Ionic stockholders had expressed interest in calling a special meeting to effectuate Board change, and offered to meet to discuss director candidates.[100]

- When the Board met the following week, on January 16, it discussed the "hostile activists" and their books and records demands.[101]

- On January 20, LaPuma sent an email describing Vejseli as a "putative Board candidate" and "aspiring fiduciary."[102]

- On January 21, when exchanging messages about Cagney's social media posts, DiFiore told Duffy that "we should hire a proxy solicitor if we haven[']t yet."[103]

- Flanders admitted at trial that when the Board adopted the Board Reduction Resolution on February 6, he was "aware that there was a desire for a dissident slate."[104]

Because the Board Reduction Resolution was not adopted on a "clear day," but in the face of a mounting proxy contest, enhanced scrutiny applies. *Coster*, 300

---

[98] Tr. (Flanders) at 240:3–6.

[99] JX 139.

[100] JX 154.

[101] JX 162.

[102] JX 164.

[103] JX 165.

[104] Tr. (Flanders) at 253:11–13.

A.3d at 672; *Pell*, 135 A.3d at 973 (applying enhanced scrutiny where the board "acted in the face of an anticipated proxy contest").

### 2. The Director Defendants Breached Their Fiduciary Duties By Adopting The Board Reduction Resolution.

The Delaware Supreme Court's decision in *Coster* lays out the roadmap for applying enhanced scrutiny under *Unocal* and *Blasius*. "When a stockholder challenges board action that interferes with the election of directors or a stockholder vote in a contest for corporate control, the board bears the burden of proof." *Coster*, 300 A.3d at 672–73. To determine whether the Board has met its burden:

> First, the court should review whether the board faced a threat "to an important corporate interest or to the achievement of a significant corporate benefit." The threat must be real and not pretextual, and the board's motivations must be proper and not selfish or disloyal. . . .
>
> Second, the court should review whether the board's response to the threat was reasonable in relation to the threat posed and was not preclusive or coercive to the stockholder franchise. To guard against unwarranted interference with corporate elections or stockholder votes in contests for corporate control, a board that is properly motivated and has identified a legitimate threat must tailor its response to only what is necessary to counter the threat. The board's response to the threat cannot deprive the stockholders of a vote or coerce the stockholders to vote a particular way.

*Id.*

#### a. Whether The Board Faced A Threat To An Important Corporate Interest

The Board failed to prove that the Board Reduction Resolution was adopted for a valid, non-pretextual corporate purpose. The principal justification offered in

30

this litigation is that the Board Reduction Resolution "increase[d] efficiencies, including to have an odd number of directors in order to avoid deadlock, and to decrease costs."[105] Importantly, however, there is *no* contemporaneous record suggesting that the Board actually considered those purposes before approving the Board Reduction Resolution.[106] Because the Board did not meet to discuss the Board Reduction Resolution, there are no minutes memorializing any deliberation. Nor does the Board Reduction Resolution itself identify the corporate purposes the Board sought to achieve through its adoption.[107] Instead, the *only* evidence supporting the Board's explanation for the Board Reduction Resolution is the *post hoc* testimony of the Director Defendants themselves.[108] That is not dispositive, but the lack of *any* record supporting the Director Defendants' justifications raises eyebrows.

---

[105] DB at 63.

[106] *See* JX 255 (email from Schnaidt explaining the "business reason" for the Board Reduction Resolution *after* it was adopted). Defendants assert that "the Board discussed at a January 16, 2025 meeting the 'need for an odd number' of directors to 'eliminate deadlocks[,]' discussed whether it should be seven or five, and decided to take 'a little more time to weigh that decision[.]'" DPTB at 29 (quoting Tr. (Duffy) at 336:9–16). However, minutes of the January 16 meeting do not evidence that purported discussion. *See* JX 162.

[107] JX 185.

[108] Tr. (Flanders) at 253:3–257:15; Tr. (Duffy) at 334:15–23, 336:9–16, 360:10–362:17; Tr. (LaPuma) at 436:20–438:24; Tr. (DiFiore) at 509:3–11, 544:4–545:12. While Defendants argue that the Board did not consider the potential proxy contest when deciding to adopt the Board Reduction Resolution, they wholly rely on self-serving testimony. *See* DPTB at 29 n.150; Tr. (Flanders) at 210:16–19 (Q. "And had the board discussed all of these issues prior to this February 6th unanimous written consent?" A. "Yes."); Tr. (Duffy)

The Board's shifting explanations in this litigation further evoke skepticism. When opposing expedition, Defendants represented that "[t]he Board Reduction [wa]s a consequence of Ionic's December 4, 2024 termination of the Hut 8 arrangement."[109] But as it turned out, Hut 8's termination reduced the Board from eight to six—not five—directors. So, to explain the second reduction, Defendants had to change course to argue that the Board Reduction Resolution was adopted to save costs and avoid deadlock.[110] Those reasons, entirely divorced from the evidentiary record, seem to have been created for purposes of this litigation.

To be sure, the justifications for the Board Reduction Resolution that the Board now offers have some truth to them. Even Plaintiffs agree that saving costs is a valid purpose and that Ionic does not need more directors.[111] But the Board could have explored other solutions for saving costs that did *not* involve eliminating

---

at 363:6–16 (Q. "But you did not consider the impact of the board reduction resolution on the 2025 annual meeting; correct?" A. "That's correct." Q. "That wasn't one of the board's considerations when it shrank the board; right?" A. "Right." Q. "No one raised the fact that shrinking the size of the board would have an impact on the 2025 annual meeting; correct?" A. "Correct."); Tr. (LaPuma) at 444:15–17 (Q. "Was the decision to reduce the board motivated by a desire to entrench yourself?" A. "No, it was not.").

[109] Opp'n to Pls.' Mot. for Expedited Proceedings Seeking to Enjoin the March 17, 2025 Annual Meeting ¶ 33, Dkt. 6.

[110] DB at 63; *see also id.* at 42 ("The reduction in the size of the Board was an issue the Director Defendants had discussed prior to executing the consent. The Board did so to increase efficiencies, avoid deadlock, and continue to decrease Board-related costs, with one of the five seats left open for a prospective CEO.").

[111] Tr. (Vejseli) at 89:11–91:6.

32

a director seat immediately prior to the stockholders' first opportunity ever to elect directors. There is no record that alternative cost saving measures were considered.[112] Similarly, setting an odd number of directors to avoid the possibility of deadlock might make sense in many circumstances. But the Board Reduction Resolution here did not really accomplish that supposed goal. Before the Board Reduction Resolution, the Board comprised six seats with two vacancies, resulting in an even number of directors voting. After the Board Reduction Resolution, the Board comprised five seats with one vacancy, still leaving an even number of directors voting until, at some point in the future, Ionic hired a new CEO to fill the final vacancy.[113]

Notably, at trial, Flanders offered a different explanation for the Board Reduction Resolution that rang truer than any of the others offered in briefing. He testified that the Board did "not want[] to try to recruit a new director into a situation that was such a pitched environment" and "was afraid [Ionic] wouldn't be able to recruit a high-quality board member until [it] calmed the waters a bit."[114] In other words, only one incumbent Class I director remained, and it would be difficult for

---

[112] *See* Tr. (Flanders) at 254:17–255:11; Tr. (Duffy) at 361:11–362:3.

[113] Tr. (Flanders) at 258:3–259:3; Tr. (Duffy) at 360:22–23, 362:4–17; Tr. (LaPuma) at 424:12–17.

[114] Tr. (Flanders) at 208:20–24.

the Board to find a nominee to recommend for the second vacancy at this time. Reducing the number of directors so that the Board, rather than the stockholders, could later identify better candidates is not a legitimate corporate purpose. *See Pell*, 135 A.3d at 790 (finding directors' decision to reduce board size "so that they, rather than the Company's stockholders, could determine who would serve on the Board" was not a valid corporate purpose). As our case law makes clear, "[t]he notion that directors know better than the stockholders about who should be on the board is no justification at all." *Mercier*, 929 A.2d at 811.

### b. Whether The Board's Response Was Reasonable And Not Preclusive

The Board also failed to prove that the Board Reduction Resolution is reasonable and not preclusive. Even if the Board had proven its purported objectives of cost savings and avoiding deadlock, the Board Reduction Resolution was not necessary to accomplish those objectives. As noted above, the Board could have explored ways to save costs that did not interfere with a director election, and the Board Reduction Resolution resulted in an even number of directors that would not avoid deadlock.

The Board Reduction Resolution is also preclusive. "For a measure to be preclusive, it must render a successful proxy contest realistically unattainable given the specific factual context." *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 603 (Del. 2010). As this Court has explained under similar facts, the Board Reduction

34

Resolution "made success in a proxy contest realistically unattainable" by "eliminat[ing] the possibility of success for two seats." *Pell*, 135 A.3d at 788. Before the Board Reduction Resolution, "stockholders had the opportunity to elect [two] directors[,]" but after, "they could elect only one director." *Id.* "By eliminating [a] seat[], the Board made it impossible for stockholders to elect directors to th[at] position[]. By doing so, the Board imposed its favored outcome on the stockholders: no new directors." *Id.*

* * *

The Board failed to prove that the Board Reduction Resolution was adopted for a valid, non-pretextual corporate purpose or that the Board Reduction Resolution is reasonable and not preclusive. Plaintiffs have succeeded in proving that the Director Defendants breached their fiduciary duties by adopting the Board Reduction Resolution.

## B. The Director Defendants Did Not Breach Their Fiduciary Duties By Rejecting The Nomination Notice.

In Count III, Plaintiffs contend that the Director Defendants breached their fiduciary duties by improperly rejecting a Nomination Notice that complied with the Advance Notice Bylaw; and that even if the Nomination Notice did not comply, the Director Defendants' application of the Advance Notice Bylaw was inequitable.

35

### 1. The Nomination Notice Failed To Comply With The Advance Notice Bylaw.

"Advance notice bylaws, provisions that require stockholders to provide the corporation with prior notice of their intent to nominate directors along with information about their nominees, are 'commonplace.'" *Openwave Sys. Inc.*, 924 A.2d at 238–39 (quoting *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 43 (Del. Ch. 1998), *aff'd on other grounds sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998)). Advance notice bylaws are "designed and function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations." *Kellner*, 320 A.3d at 257–58 (quoting *Openwave Sys. Inc.*, 924 A.2d at 239).

"[C]onsideration of an advance notice bylaw's application begins with a contractual analysis" that asks: "were the bylaws clear and unambiguous, did the stockholder's nomination comply with the bylaws, and did the company interfere with the plaintiff's attempt to comply[?]" *Strategic Inv. Opportunities LLC*, 2022 WL 453607, at *9. Bylaws are contracts between the stockholders and the corporation, interpreted according to their "commonly accepted meaning unless the context clearly requires a different one or unless legal phrases having a special meaning are used." *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 977 (Del. 2020) (quoting *Hill Int'l, Inc. v. Opportunity*

36

*P'rs L.P.*, 119 A.3d 30, 38 (Del. 2015)).  If a bylaw provision is ambiguous, courts will "resolve any doubt in favor of the stockholder's electoral rights."  *Id.* (quoting *Hill Int'l, Inc.*, 119 A.3d at 38).

The Board rejected the Nomination Notice because it failed to (1) attach copies of the Solicitation Agreement, September 11 MNDA, and December 10 MNDA; or (2) disclose the existence of the First Group Agreement, Second Group Agreement, and Third Group Agreement, among other agreements.[115]  The Board's second reason for rejecting the Nomination Notice—the failure to disclose the existence of material agreements between Plaintiffs, Figure Markets, and GXD— carries the day.

Plaintiffs argue that the Nomination Notice did not have to disclose the agreements in question because they "were no longer operative at the time of the Nomination Notice."[116]  The Second Group Agreement amended and restated the

---

[115] JX 245 at 9 (YCST Memo advising that the failure to "provide the agreements . . . is the basis [for] a determination that the nominating stockholders did not comply with the advance notice bylaws"); *id.* at 11 (stating that the failure to "attach" the Solicitation Agreement and two other agreements "arguably violates Items 6 and 7"); *id.* at 12–13 (identifying undisclosed agreements, engagement letters, and document preservation notices); JX 260 (advising Plaintiffs that the Nomination Notice "(1) failed to attach a copy of the funding agreements between the Nominating Stockholders' and Figure Markets/GXD; and (2) failed to disclose any information about the plans and proposals for Ionic held by the group consisting of the Nominating Stockholders, Figure Markets, and GXD").

[116] PB at 65.

First Group Agreement on October 7, 2024;[117] the Third Group Agreement "disbanded" the group under the Second Group Agreement on October 21, 2024;[118] and the Solicitation Agreement terminated the Third Group Agreement on February 14, 2025—the same day the Nomination Notice was submitted.[119]

Plaintiffs' position, under these facts, contravenes the informational purpose of the Advance Notice Bylaw. Informational requirements "serve[] an important disclosure function, allowing boards of directors to knowledgably make recommendations about nominees and ensuring that stockholders cast well-informed votes." *Strategic Inv. Opportunities LLC*, 2022 WL 453607, at *9. In particular, disclosing "agreements, measures, or plans taken towards a common end" is critical not only because "[t]here are legitimate reasons why the Board would want to know whether a nomination was part of a broader scheme relating to the governance, management, or control of the Company[,]" but also because such information is "important to stockholders in deciding which director candidates to support." *Jorgl v. AIM ImmunoTech Inc.*, 2022 WL 16543834, at *16 (Del. Ch. Oct. 28, 2022). That purpose is ill served if a stockholder omits disclosing an agreement terminated *the*

---

[117] JX 64.

[118] JX 80.

[119] JX 539.

*same day* it submits a nomination notice, as Plaintiffs did here.[120] There is little doubt that "[s]tockholders would want to know" about recently terminated agreements "when deciding how to vote their shares." *CytoDyn Inc.*, 2021 WL 4775140, at *20 (citing *Louden v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997)).

The Court does not need to definitively resolve whether Plaintiffs were required to disclose recently terminated agreements, however. Even assuming Plaintiffs were only required to disclose extant agreements, the Nomination Notice still failed to disclose a material provision in a "terminated" agreement that expressly survived termination.[121] Namely, Paragraph 7 of the Third Group Agreement states that for one year, "no Member of the Group shall enter into any agreement, arrangement or understanding with [Ionic] relating to the Purpose unless such agreement, arrangement or understanding includes a commitment of [Ionic] to" the following:[122]

> (ii) negotiating with the Company and taking such other actions as may be necessary or advisable (including, without limitation, pursuing the calling of a special meeting of the stockholders of the Company), to enter into a cooperation agreement with the Company containing

---

[120] Plaintiffs terminated the Third Group Agreement the same day they submitted the Nomination Notice. PTO ¶¶ 28, 29; JX 539.

[121] JX 80.

[122] *Id.* ¶ 7.

customary non-disparagement provisions and the agreement of the Company to cause . . . (c) the formation of two new committees of the Board, one to lead the search for a new CEO, which committee will include at least two of the New Directors and which committee will consider Mike Abbate as a candidate for CEO, and one to conduct a strategic and operating review of the business, which committee will include at least three of the New Directors and will (1) consider terminating the contract between the Company and U.S. Data Management Group, LLC ("Hut 8") and consider GXD as a replacement provider of the services currently provided by Hut 8 and (2) consider listing the securities of the Company on Figure Markets' ATS market . . . .[123]

Plaintiffs do not argue that the agreement reflected in Paragraph 7 is immaterial, only that it is "moot" because "the focus of the Group ha[s] shifted" from holding a special meeting to running a proxy contest at the Annual Meeting.[124] Importantly, however, nothing in the record suggests this contractual obligation was terminated or waived before the Nomination Notice was sent.[125] The existence of a commitment to support the types of proposals described in Paragraph 7 "would have been important to stockholders in deciding which director candidates to support." *Jorgl*, 2022 WL 16543834, at *16. Plaintiffs have therefore failed to show that the

---

[123] *Id.* ¶ 4.

[124] PB at 19, 65–66; Tr. (Vejseli) at 98:13–14 (Q. "And this contract says under paragraph 7, 'This obligation shall survive any termination of the Agreement.' Right?" A. "Yes, but this is impossible unless a special meeting"); Tr. (Perry) at 183:7–8 ("Again, parties have changed. It's irrelevant"); Tr. (Villinger) at 159:5–6 ("I cannot speak to this because I understand that [the provision] is not in effect today.").

[125] While Plaintiffs argued at trial that Figure Markets and GXD could submit letters confirming that the parties have waived or terminated Paragraph 7, they conceded such letters were not prepared before the Nomination Notice was delivered. Tr. at 571:7–24.

Nomination Notice complied with the Advance Notice Bylaw's disclosure requirements.[126]

## 2. The Board's Rejection Of The Nomination Notice Was Not Inequitable.

"[T]he Delaware Supreme Court wrote 50 years ago in *Schnell* that 'inequitable action does not become permissible simply because it is legally possible.'" *CytoDyn Inc.*, 2021 WL 4775140, at *15 (quoting *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971)). Thus, "[t]he court's analysis does not necessarily end if a stockholder fails to comply with the plain terms of an advance notice bylaw." *Strategic Inv. Opportunities LLC*, 2022 WL 453607, at *9. Instead, "Delaware law necessarily leaves room for assessing whether a board's actions in enforcing a clear advance notice bylaw were justified, consistent with the doctrine of *Schnell*." *Id.* at *15. Under *Coster*, because the Board's rejection of the Nomination Notice implicates a director election, the Court applies enhanced scrutiny with a *Blasius* gloss to determine (1) if the Board rejected the Nomination Notice for legitimate, rather than pretextual, selfish, or disloyal, reasons, and (2) if

---

[126] Plaintiffs argue that the Board cannot rely on Paragraph 7 to justify its rejection of the Nomination Notice because it was not specifically referenced in the YCST Memo. PPTB at 23. That argument misses the mark. The Board rejected the Nomination Notice based on the failure to disclose numerous agreements, including the Third Group Agreement. Defendants' reliance on Paragraph 7 is not a "new" argument; rather, Paragraph 7 is a material provision that underscores why Plaintiffs' response that all undisclosed agreements were terminated is wrong.

the rejection was reasonable and was not preclusive. *Coster*, 300 A.3d at 672–73. The Board bears the burden of proof. *Id.*

### a. Whether The Board Faced A Threat To An Important Corporate Interest

The Board proved at trial that it rejected the Nomination Notice to advance important corporate interests. The Advance Notice Bylaw's disclosure requirements serve legitimate objectives. "Directors and stockholders . . . justifiably want to know whether a nomination is part of a broader scheme." *Kellner v. AIM ImmunoTech Inc.*, 307 A.3d 998, 1044 (Del. Ch. 2023), *aff'd in part, rev'd in part on other grounds*, 320 A.3d 239 (Del. 2024). "The concealment of arrangements and understandings that go to the heart of a nomination effort risks undermining the essential disclosure function of advance notice bylaws." *Id.* "Rejecting a nomination notice for failing to disclose plans or proposals . . . promotes the disclosure function of advance notice bylaws." *Paragon Techs., Inc. v. Cryan*, 2023 WL 8269200, at *13 (Del. Ch. Nov. 30, 2023). The Board here appropriately "conclude[d] that the objective of preserving an informed stockholder vote was threatened." *Kellner*, 307 A.3d at 1042.

Plaintiffs contend that the Board's decision to reject the Nomination Notice was preordained and pretextual, focusing on the brief timing between the Board's

receipt of the YCST Memo and its decision to reject the Nomination Notice.[127]  But "the context in which the Board received" the Nomination Notice "cannot be ignored."  *Kellner*, 307 A.3d at 1042–43 (quoting *Jorgl*, 2022 WL 16543834, at *16).  The Board knew that Plaintiffs' Nomination Notice was backed by two non-stockholders motivated by separate commercial interests.[128]  The Director Defendants credibly testified that they believed understanding the specifics of all arrangements between Plaintiffs, Figure Markets, and GXD would be highly material to stockholders deciding who to support at the Annual Meeting.[129]

---

[127] *See* PB at 26–27; JX 411; Tr. (Flanders) at 270:2–15; Tr. (Duffy) at 399:4–19; Tr. (LaPuma) at 491:6–22; Tr. (DiFiore) at 543:8–18.

[128] *See, e.g.*, JX 52 (rejecting the September Demand in part because the purpose included "pressuring [Ionic] to trade on Figure Markets' platform rather than NASDAQ"); JX 101 (conditioning production of the stock list on the Outside Funds Provision); JX 147 ("[The Board] note[s] and stress[es] that Olshan represents . . . [Figure Markets], who is not a stockholder of [Ionic]."); JX 247 (meeting minutes stating that the Board discussed concerns "that without complete information in the Notice, stockholders would not be able to properly vet proxy solicitations from the Dissident Stockholders who are financially backed by non-stockholder third-parties").

[129] *See, e.g.*, Tr. (Flanders) at 212:4–8 ("[T]he connection to Figure Markets and GXD was a concern to me."); *id.* at 217:19–24 ("The big concern that surfaced was that in the nomination notice not every agreement had been disclosed, and some that had been disclosed had not been attached."); Tr. (Duffy) at 345:7–16 ("We discussed the documents that were submitted along with the nomination notice, and then discussed documents that were later produced through discovery at the books and records case that were not submitted with the nomination notice and why they should have been.  And ultimately why the nomination notice should be rejected there, because of the lack of disclosure."); Tr. (LaPuma) at 440:19–22 (explaining that the purpose of the Advance Notice Bylaw is "to provide transparency to shareholders about who is being potentially nominated or put forth as a candidate to be on the board of a company").

Plaintiffs also argue that the Board's conduct in dealing with Ionic's stockholders casts doubt on its motives for rejecting the Nomination Notice. This argument is not frivolous. To some extent, the Board's inequitable adoption of the Board Reduction Resolution colors its rejection of the Nomination Notice. Plaintiffs also contend that the Board strategically timed announcement of the Annual Meeting to minimize the number of days in which a nominating stockholder could submit a nomination notice.[130] But weighing all the evidence, I remain convinced that the Board properly rejected the Nomination Notice to advance a legitimate corporate purpose.

Separately, Plaintiffs assert that the Board acted inequitably by failing to provide them an opportunity to supplement the Nomination Notice before the nomination window closed. The nomination window closed two days after Plaintiffs submitted the Nomination Notice. On that truncated timeline, I cannot find that the Board's failure to respond sooner amounted to "manipulative conduct." *See CytoDyn*, 2021 WL 4775140, at *17 ("[T]he Board certainly would have a harder

---

[130] PB at 2. The February 6 Press Release resulted in a nomination window that closed on a Sunday, such that nominating stockholders who requested a director nominee questionnaire on the day the press release issued would have just one business day to submit a completed nomination notice if Ionic used the entire five-business-day period to produce the questionnaire. Bylaws § 2.4(v). In actuality, Ionic produced the questionnaires on February 12, JX 532, and allowed Plaintiffs to submit the questionnaires on February 17, such that Plaintiffs had two business days to complete the questionnaires. JX 206.

44

time justifying its silence in the face of its fiduciary duties when, upon receipt of a deficient nomination notice, *ample time* remained before the arrival of the notice deadline." (emphasis added)).[131]

### b. Whether The Board's Response Was Reasonable And Not Preclusive

The Board also proved that its enforcement of the Advance Notice Bylaw was reasonable and did not preclude Plaintiffs from submitting a compliant Nomination Notice. Enforcing the Advance Notice Bylaw is a reasonable means of ensuring that stockholders receive material information about director nominees. And although Plaintiffs argue that the Board strategically timed announcement of the Annual Meeting to minimize the nomination window, Plaintiffs did, in fact, submit a timely Nomination Notice. Plaintiffs could have complied with the Advance Notice Bylaw's disclosure requirements, but they did not. The record does not support Plaintiffs' position that the Board's rejection of the Nomination Notice was unreasonable or preclusive.

### C. Irreparable Harm, Balancing The Equities, And The Nature Of The Injunction

As set forth above, Plaintiffs succeed on the merits of Count I. To demonstrate their entitlement to mandatory injunctive relief, Plaintiffs also must establish

---

[131] Notably, Plaintiffs produced the undisclosed agreements in the 220 Action on February 23, *after* the nomination window closed. *See* JX 428.

irreparable harm in the absence of an injunction, and that the balance of the equities favors injunctive relief. *Strategic Inv. Opportunities LLC*, 2022 WL 453607, at *8. Both requirements are met.

"Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares." *Telcom–SNI Invs., L.L.C. v. Sorrento Networks, Inc.*, 2001 WL 1117505, at *9 (Del. Ch. Sept. 7, 2001) (quoting *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151 (Del. Ch. Jan. 14, 1991)), *aff'd*, 790 A.2d 477 (Del. 2002). Without some form of injunctive relief, Ionic stockholders will be prevented from exercising their voting rights by electing two directors at the Annual Meeting. "This loss of voting power constitutes irreparable injury." *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *11 (Del. Ch. Aug. 27, 1987).

Balancing the equities also supports injunctive relief. In the absence of an injunction, stockholders risk losing "sacrosanct" voting rights. *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012). Defendants, on the other hand, face no hardship from an injunction. *See Pell*, 135 A.3d at 794 ("Even when the incumbents themselves could be voted out of office, that fact does not support a claim of hardship.").

Plaintiffs have established their entitlement to an order invalidating the Board Reduction Resolution and restoring the Board to six directors, including two Class I

directors. The parties disagree, however, on the effect that remedy should have on the Annual Meeting, given that the Board has proposed only one director nominee and Plaintiffs' Nomination Notice proposing two other director nominees was properly rejected. Defendants point out that "[o]rdinarily, if a vacancy exists on a classified board, the remaining directors fill it by appointment until the next stockholder meeting."[132] But the crux of Count I is that the Director Defendants breached their fiduciary duties by inequitably interfering with a corporate election by reducing the number of directors that Ionic stockholders will elect at the Company's first Annual Meeting. A remedy that would permit the directors who breached their fiduciary duties to choose who will serve on the Board is no remedy at all.

Instead, to appropriately restore the stockholders' ability to elect two Class I directors at the Annual Meeting, an injunction will issue directing the Board to reopen the ten-day nomination window under the Advance Notice Bylaw to allow the Board, Plaintiffs, and any other Ionic stockholder to submit director

---

[132] DPTB at 48.

nominations.[133]  *See Hubbard*, 1991 WL 3151, at *12 (reopening nomination window due to "a material change in circumstances").

Defendants assert that Plaintiffs should be "categorically bar[red]" from submitting a new nomination notice "regardless of how many seats are up for election" because "allowing Plaintiffs to nominate candidates despite their noncompliance with critical requirements" in the Advance Notice Bylaw "would undermine the purposes and integrity" of advance notice bylaws by "reward[ing] stockholders for concealing material information . . . ."[134]  Under the unusual facts of this case, I disagree for two reasons.  First, it is true that in most circumstances, Plaintiffs would not get a "do-over" after failing to comply with the Advance Notice Bylaw.  But here, it is not Plaintiffs' but the Board's wrongful conduct that necessitates reopening the nomination window.  Second, the trial record does not support Defendants' position that Plaintiffs intentionally "concealed" material information.  To the contrary, Plaintiffs produced the undisclosed agreements at issue (including the Third Group Agreement) in the 220 Action within days of

---

[133] Defendants propose that the Court appoint a "neutral third party as a custodian with the limited authority to appoint a nominee for the second Class I seat" or that "the Court itself . . . select an independent candidate," suggesting that either approach would ensure that the Class I vacancy is filled by an experienced, independent director. *Id.* at 50–51.  I decline that invitation.  The Board is free to nominate an experienced, independent director, as are Plaintiffs.  Ionic's stockholders—not this Court—will decide who serves on the Board.

[134] *Id.* at 52.

submitting the Nomination Notice, and have openly disclosed Figure Markets' and GXD's involvement in the proxy contest.[135]  Defendants offer no real reason why Plaintiffs should not be permitted to submit a new nomination notice during the reopened nomination window so that, with the benefit of full disclosure, Ionic's stockholders, who have not been able to exercise their voting rights since the Company's incorporation, can finally decide for themselves who should serve on the Board.

### D.     Defendants Must Correct Disclosures About The Board Reduction Resolution And The Annual Meeting.

Count IV asserts a claim for breach of fiduciary duty premised on disclosure violations.  Plaintiffs seek an order requiring corrective disclosures to remedy the purported violations.

"[W]hen directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty."  *Malone v. Brincat*, 722 A.2d 5, 10 (Del. Ch. 1998) (citing *Marhart, Inc. v. Calmat Co.*, 1992 WL 212587 (Del. Ch. Aug. 19, 1992)).  "It is well-established

---

[135] *See, e.g.*, JX 202 at 20 (Plaintiffs disclosing Figure Market's and GXD's commercial interest in the Nomination Notice); JX 71 (Vejseli and Figure Markets collecting stockholder information on a form with Figure Markets' logo); JX 43 (Vejseli demanding books and records on Figure Markets' letterhead); JX 166 (Cagney of Figure Markets posting on social media regarding the Ionic stockholder meeting and nominating a board slate).

that the duty of disclosure 'represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.'" *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)). Information is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (cleaned up).

Plaintiffs first argue that Ionic disseminated false and misleading disclosures stating that only one Class I director seat is up for election at the Annual Meeting.[136] To ensure that stockholders are fully informed, Ionic must disclose the Court's ruling in this action, including the new date of the Annual Meeting and the Court's order that the nomination window be reopened for ten days to permit any Ionic stockholder to nominate directors for the two Class I seats up for election.[137]

---

[136] JX 227; JX 228; JX 229; JX 240.

[137] Plaintiffs relatedly argue that on March 26, Ionic issued a press release stating that "the Company published its amended bylaws on its website on February 20, 2025, which differs from the Group's claim that it was added after the Group had submitted their Notice." JX 283. That statement is misleading because it suggests that the Board disclosed the Board Reduction Resolution before Plaintiffs submitted the Nomination Notice, which is false.

Plaintiffs also argue that Ionic disseminated false and misleading disclosures stating that the Nomination Notice failed to comply with the Advance Notice Bylaw.[138] Those disclosures are true, so corrective disclosures are unnecessary.

Finally, Plaintiffs contend that Ionic disseminated false and misleading disclosures concerning Figure Markets and GXD. Plaintiffs argue that a March 26 press release falsely stated that Plaintiffs' nominees will cause Ionic to enter "value-destructive contracts with Figure Markets and GXD."[139] Plaintiffs have not demonstrated that this disclosure, which reflects the Board's opinion,[140] is false, let alone that it was made carelessly or disloyally. Similarly, Plaintiffs contend that Ionic issued disclosures claiming that Figure Markets and GXD "leverag[ed]" Plaintiffs to file the 220 Action "in their name,"[141] Plaintiffs are acting "on behalf of" Figure Markets and Michael Cagney in the proxy contest, and Plaintiffs seek "to elect the Dissident Nominees to advance the financial interests of Mr. Cagney and

---

But given the Court's rulings herein, I believe a disclosure correcting that misstatement would cause further confusion. The Court therefore will not order Ionic to make corrective disclosures addressing that specific statement in the press release.

[138] *See* JX 227; JX 229; JX 240; JX 259.

[139] JX 283.

[140] *Cf. Consol. Fisheries Co v. Consol. Solubles Co.*, 112 A.2d 30, 37 (Del. 1955) ("It is the general rule that mere expressions of opinion . . . cannot be deemed . . . misrepresentations.").

[141] JX 275.

Figure Markets."[142]  Again, Plaintiffs have not proven that such disclosure is false, or was made carelessly or disloyally.[143]

## III.  CONCLUSION

For the reasons explained above, judgment is entered for Plaintiffs on Count I and aspects of Count IV, and an injunction will issue as set forth herein.[144] Judgment is entered for Defendants on Count III.  The parties are directed to meet and confer on a proposed form of order to implement the rulings in this memorandum opinion.

---

[142] JX 227; JX 229; JX 240.

[143] Plaintiffs contend that the Court's post-trial ruling in the 220 Action contradicts Ionic's statements, but it does not.  The Court issued a narrow finding that Plaintiffs had a proper purpose for seeking a stock list, explaining that Vejseli did not "'len[d] his name' to the stock list demand" and that Plaintiffs were not "'proxies', 'surrogates,' or 'shills'" for Figure Markets and GXD.  *See Vejseli v. Ionic Digit., Inc.*, C.A. No. 2025-0138-BWD, at 16:11–12 (Del. Ch. Mar. 13, 2025) (TRANSCRIPT); *id.* at 37:8–10.  The Court did not determine whether Figure Markets and GXD "leveraged" Plaintiffs to obtain books and records or whether Plaintiffs are acting "on behalf of" Figure Markets and GXD to advance their financial interests in the proxy contest now.

[144] The parties also seek an order shifting fees.  The Court declines to issue an expedited ruling on fee shifting.  The parties are not precluded from moving for fees if they deem appropriate.